W. M. SUTTON AND WIFE *vs.* J. A. J ASKEW, *et al.*

1.  Previous to the statutes of 1866–'67, and 1868–'69, purporting to restore to married women the common-law right of dower, the wife had only an *inchoate* right of dower in the lands of her husband, subject to be defeated at any time, by the husband's conveyance.

2.  When land was acquired, and a marriage was contracted, previous to the statutes aforesaid, *held*, that these statutes cannot affect the rights of the hus-band, nor restrict his power of alienation, nor confer upon the wife any right of dower, which she did not have before.

3.  Whether it is competent for the General Assembly to give a married woman a right of dower in land acquired after the passage of the statutes referred to, although the marriage took place before that time.   Quere ?

4.  An agreement to pay a married woman a certain sum of money for *her right of dower* in the land of her husband, when the land was acquired, and the marriage was contracted before March 2nd, 1867, is void against creditors, for want of consideration.

5.  It would seem that before a married woman can set up her consent, as a con-sideration to support a contract, to give her a part of the purchase money for a tract of land, sold by her husband, it ought to appear that she had released her right of dower or covenanted against incumbrances; and, *quere*, whether, in any case, it could depend upon parol evidence, and, whether the contract must not be set out in the deed, and appear to be fair and reasonable.

6.  The distinction between a wife's right to a homestead and dower, and other matters connected with the subject, stated and fully discussed by Reade, Judge.

Dick and Rodman, JJ., dissenting.

This was a proceeding, under the 266th section of the C. C. P., to subject the property of a judgment-debtor, had before Pool, Judge, at Fall Term 1871, of Bertie Superior Court.

The facts were found by the Judge, to be as follows: " The judgment-debtor, J. A. J. Askew, in the year 1870, was the the owner of two houses and lots, and a store-house, in Bertie county, and proposed to one Augustus Holley, to borrow two

thousand dollars, and to secure him in said loan, by a deed of trust, upon said houses and lots. The said Holley was unwilling to take the security, unless the defendant, the wife of said Askew, would join in the conveyance with her husband. The defendant, Maria C. Askew, refused to join in the conveyance, unless she was compensated for releasing her right of dower and homestead. Whereupon, it was agreed, that if the said Maria C. Askew would join in the conveyance, she should have the balance of the money arising from the proceeds of the sale of the houses and lots, after paying Holley the principal and interest of his money. With this understanding the deed was executed. The houses and lots were afterwards sold by the trustee, for $3,400, and out of the proceeds, the debt and interest to Holley, and the expenses of the trust, &c., were paid off and discharged.

The lots were sold on a credit, and the purchaser gave in part payment, two notes, one for $500, and one for $481. These two notes the trustee endorsed, without recourse, to the defendant, Maria C. Askew, in furtherance of the agreement, which had been made with her. All of the $481 note, with the concurrence of Maria C. Askew, had been collected and paid to the creditors of her husband, before the judgment of the plaintiff, except about $100, which was agreed to be paid. The other note, of $500, was retained by the said Maria C. Askew, and claimed as her property. The conveyance to Holley was made before the plaintiff's judgment was obtained. J. A. J. Askew, and Maria C. Askew, were married before January, 1867. The debt due the plaintiff was contracted previous to the making of the deed in trust. Upon this state of facts, the Court was of opinion, that the property, in the $500 note, was in Maria C. Askew, the defendant, and dismissed the proceedings and gave judgment against the plaintiff for costs. Plaintiff appealed from this judgment.

*W. N. H. Smith* for plaintiff.
*D. A. Barnes* for defendants.

READE, J.  The single question is, whether the Act of 1868–'9, restoring to widows, their common law right of dower, *i. e.* dower in all the lands of which the husband was seized during coverture, prevents a husband from selling lands which he owned before the passage of the act, his marriage having been before the act.  If the act has that effect, it must be because it gives the wife an inchoate right to dower, to be consummated upon the death of the husband, she surviving, and of which she cannot be deprived without her consent; for, certainly, before the act, it was never supposed that the husband could not sell his lands at pleasure, without the consent of his wife.  If the act has that effect, then her consent in this case to the sale, was a sufficient consideration to support the agreement to give her a part of the sale-money.  If the act had not that effect, then her consent was immaterial, and afforded no support to the agreement, to give her a part of the sale-money, and therefore, as against creditors, the transaction was void. It is a dry question of law, and must be so considered; although it is admitted to be one of great importance, and by no means free from difficulty.

Since 1784, and until the act aforesaid, 1868–'69, a widow was entitled to dower in the lands only, of which the husband died seized and possessed, and therefore, but few questions have arisen in our State in regard to dower-rights, and none probably in regard to inchoate dower-rights.  But the important change which that Act 1868–'69, made, involves the subject in much uncertainty, and will breed much litigation. What adds to the uncertainty is, that the different States have different laws, in regard to dower, and the decisions in the State Courts are numerous and conflicting.  Some of the decisions holding, that acts like ours are retro-active, and others holding them to be prospective, only.  And the reasons, which would be proper in one case, are inconsiderately used in the other.  *Scribner on Dower*, a late American work, reviews the statutes and decisions of the different States, and also the

English authorities and by judicious comments, has endeavored to produce some order out of much confusion. But, speaking of the inchoate right of dower as property, he says : "A certain vagueness of expression, uniformly characterizes the discussion of the subject, and, these discussions are commonly attended with unsatisfactory results." And so, we see, that this great right, favored like life and liberty, instead of being as it ought to be, and as until lately it has been, so plain, that he that runs may read, is now involved in much confusion, by inconsiderate legislation and conflicting adjudications.

It has been much discussed, whether marriage is a contract, or an institution, or a sacrament, or all combined ; and, especially, whether dower results from the contract of marriage, or from the operation of law. Suppose it to result from the contract of marriage, then it is discussed, whether the Legislature can change the law of dower, without impairing the obligation of contracts. Suppose it to result from the operation of law, then it is discussed whether the Legislature can change it without interfering with vested rights, and whether the law cannot change, modify, increase or abolish it. Those who claim to be up with the chivalry of the age, and while the Legislatures are liberally *enlarging* the dower-right, insist, that the Legislature have full power over the subject. But suppose upon some occasion, when the chivalric element may less prevail in legislation, they should *curtail*, or even *destroy* the right, how then ? And if the dower-right is so frail that a widow may be deprived of it without her consent, how was her consent to the deed in this case important, even supposing the act to be retro-active ; and if not important, then it was no consideration, and, if no consideration, then the contract was void. So that the agreement is suicidal. If the right to dower is at the mercy of the Legislature, to increase or diminish, continue or destroy, then it is nothing—nothing as a right— nothing as property ! We think that this great right, sacred as life, and indispensable to society and the family economy,

ought to be more secure, ought to be inviolable, when once it exists, whether it be created by contract, or by operation of law. And we, by no means, subscribe to the doctrine that a right vested by operation of law, is less inviolable than when it arises from contract, when once it exists, no matter how it is inviolable. Nor is it true, that, in any conceivable case, private property can be taken for public use, or, as is said in this case, for the "paramount public good," without just compensation.

Our conclusion from what has been said, is, that before the the late act, a widow was entitled to dower in such lands as the husband should die seized and possessed of, and in no other; that the right to be so endowed commenced, (whether by the contract of marriage, or by operation of law, makes no difference) at the time of the marriage, but subject to the husband's power of sale, and contingent upon his not selling it, and upon her surviving him, and that the Legislature could not deprive her of that right, or in any way change it without her consent. The Act of 1868-'69, comes in and changes the law of dower, so as to give the widow dower, not only in all the husband owns at the time of his death, but in all that he owned during coverture, but this act does not affect rights, or marriages, which existed *before* its passage; they stand as they did before the act, when the husband could sell without the consent of the wife; and, therefore, the consent of the wife, as in this case, was immaterial, and afforded no consideration to support the contract.

We have not overlooked the fact, that the deed in this case does not profess to release the wife's dower-right, if she has any, or to covenant against the incumbrance of dower; because, under the view which we have presented, it is not necessary. But it would seem, that before the widow can set up her consent as a consideration to support a contract, to give her a part of the sale-money, it ought to appear that she had released her dower-right, or covenanted against the incum-

brance; and, *quere,* whether in any case, it could depend upon parol evidence, and whether the contract must not be set out in the deed, and appear to be fair and reasonable?

All this is said, but with little consideration as to the rights of the husband. But has the husband no rights which are en-titled to respect, and which the Legislature cannot destroy! Before the late Act, when a man married, owning land, his his wife had an inchoate right to dower, contingent upon his not conveying it away in his life time, and upon her surviving him, precisely the same as if it had been conveyed to him by deed from another, with such stipulation and conditions. Suppose it had been so conveyed to him, could the Legislature step in and alter his title, or change the conditions? No one will so contend. Well, what matters it how his title was derived, and how the conditions and stipulations came about, so that in fact they existed? Here then was the simple case of a man owning a tract of land, absolutely and in fee simple, with full power to sell the same, subject only to the condition, that if he did not sell it, and should die seized and possessed of it, his wife should have dower; and the Legislature steps in and forbids him to sell, compels him to hold it as long as he lives, and gives his wife dower in it, in spite of him. If this be not depriving him of his vested rights, taking his property from him, and giving it to another, under the notion, as is said, of the "paramount public good," without compensation, then we cannot understand what would be an instance of such a viola-tion of the rights of property.

It would probably be no great hardship upon the husband, married before the Act, and it would probably not interfere with his vested rights, to allow the Act to operate upon all lands *acquired after* the passage of the Act, because he would have notice of the incumbrance which would attach, and he would take it *cum onere.* But, as to this, we give no opinion.

And so it may be, that in all cases of marriages since the passage of the Act, the wife may refuse to join in the convey-

ance, unless she is compensated ; and an agreement to give a part of the sale-money for her consent to the sale may be good, her dower-right attaching to *all* the lands of her husbund, and contingent only on her surviving him ; a reasonable probability, and not a mere possibility. And, *quere*, whether the Legislature, by any subsequent Act, can deprive her of this right. But these questions are not before us.

II. If the dower-right did not afford a sufficient consideration to support the agreement to give the wife a part of the sale-money, then in the second place, it is insisted, that her homestead right did.

There is this difference in the dower Act, and the homestead Act—the homestead Act, applies only to the homestead, used in the sense of the home, or dwelling house, whether actually set apart or not ; or the homestead, after it is set apart, upon proceedings had for that purpose.

The lands in question had not been set apart as a homestead upon proceedings instituted for that purpose, and it is not distinctly stated that they were the homestead or dwelling in the general sense. The case describes them as "two houses and lots, one a store house." There is nothing in this to indicate that they were the homestead. Nor is there anything to indicate whether the husband did not have other lands, and whether he did have lands which he had used, or which, after this sale, he did not intend to use as a homestead. Nor is it stated whether he was insolvent. Nor is it stated whether he had children. Nor does it appear from the case stated, nor from the deed, nor in any other way, what was the estimate put upon her homestead right. Nor is there any covenant in the deed against the homestead right, nor is there any release. And surely it cannot be, under the most liberal construction of the homestead Act, that the wife is entitled to have her homestead taken out of every tract of land the husband may own, and may wish to sell! It is true, that by reference to the deed, we find that, in describing the lots, it is said, "one being

the house and lot upon which we reside," and that is all; and whether temporarily or permanently, or whether he had not another which he had adopted, or intended to adopt, as a homestead, is not said. And both lots are put together, and her homestead-right, claimed in one as much as the other. No price being fixed upon either, and no estimate of the value of her homestead.' So that, if, hereafter if she should claim a homestead in other lands, there is nothing in the transaction to estop her, or even to show how much she has received in the way of her homestead-right in this transaction, so as to deduct it from any subsequent claim. So we think that as the case appears to us, she has made out no homestead claim, the surrender of which, was a sufficient consideration to support the agreement.

We have not overlooked the fact, that the provisions in the Constitution and in the homestead Act, giving to widows homestead rights, seem not to be precisely the same. The Constitution seems to contemplate that the widow should have a homestead only in the event, that there were no children, while the Act seems to prefer the widow to the children. If there is a conflict in the provisions, it would seem, that the constitutional provision should prevail. ' But we do not decide the question, because, it is not necessary.

There is error. And judgment would be rendered here for the plaintiff, but it does not appear what amount is due from Sessoms so that this opinion must be certified to the Court below to the end that the amount of the indebtedness of Sessoms be ascertained, and judgment for that amount or for so much less as may be necessary to satisfy the judgment of the plaintiff against J. A. J. Askew, be rendered against Sessoms in the Court below.

DICK, J., *dissenting :* This is a proceeding by a creditor, under *C. C. P.*, sec. 266, to subject the property of a judgment-debtor in the hands of a third person, to the payment of a

judgment debt.   The facts presented by the case are substantially as follows :

The judgment-debtor, J. A. J. Askew was much indebted, and desired to free himself from such embarrassment, and he applied to A. J. Holly to borrow money for that purpose.

Holly agreed to furnish two thousand dollars, if Askew and wife, Maria C. Askew, would join in executing a deed in trust to him, for certain houses and lots, belonging to J. A. J. Askew, to secure the payment of the money loaned.

Maria C. Askew "absolutely and positively" refused to join in the conveyance, unless she received some compensation for her right of dower and homestead in the said lands of her husband.   It was then agreed, that if she would execute the deed in trust, so as to convey her said interest, she should receive in consideration of her relinquishment of the right of dower and homestead, the balance of the purchase-money for which said house and lots might be sold, after paying off Holly, the debt secured in the trust.   The houses and lots sold for thirty-four hundred dollars, and all the money was paid out in discharging the debts of the husband, except a note of five hundred dollars, which the trustee placed in the hands of Maria C. Askew in accordance with the agreement above stated. All of these transactions were completed before judgment was obtained by the plaintiff, against said J. A. J. Askew, and the object of this proceeding is to subject said note, in the hands of Maria C. Askew, to the payment of said judgment.

The first question presented, is whether the agreement between the said husband and wife, was founded upon sufficient consideration, to protect the property transferred to the wife, against the claim of creditors.

If she had a contingent right of dower, the contract between them by which she received money or other property in consideration of her releasing such right in her husband's land, if reasonable, and fairly entered into, should be sustained.   2 *Scribner on Dower,* 5.   *Ballard* v. *Briggs,* 7 *Pickering,* 533.   *Quarles* v. *Lacy,* 4 *Hump.* 251.

The Act of 1868-'69, ch. 93, sec. 63, provides that, "Every married woman shall be entitled to one-third interest in value of all the lands, tenements and hereditaments whereof her husband is, or may be seized and possessed at any time during coverture," &c.   It was admitted that Askew and wife were married before the passage of said Act, and that she was, at the time of the execution of the deed in trust, entitled to a contingent right of dower in the lands conveyed, unless the said Act is unconstitutional.   It is insisted that the Act is unstitutional as to antecedent marriages, for the reason :

1. It impairs the obligation of the marriage contract.

2. It interferes with the vested right of the husband.

We will proceed in the first place to consider whether the right of dower proceeds from, and is a part of the marital contract, and then enter into the discussion of other questions involved in the case.

Dower is one of the institutions of society which has come down to us from a remote antiquity.

The right of a widow to a certain portion of the lands of her deceased husband for the term of her natural life, was unknown to the laws of the Greeks and Romans, and seems to have originated with the Teutonic races, who had a higher regard for woman than any of the earlier nations.   Traces of this custom can be found in the first authentic records of Anglo Saxon history, and is the foundation of dower by particular custom.

The peculiar form of this right, known as dower at common law, is supposed, by an eminent jurist, to have been derived from a Danish law, established by Sweyn, King of Denmark, out of gratitude to the ladies of his realm, who sold their jewels, to ransom him from captivity.   Originating thus, in feelings of gratitude, and the early spirit of chivalry, inspired by the self-denying kindness and generosity of woman, dower has always been a favorite of the common law; secured in the earliest charters of English liberty, and recognized with favor

even in *Magna Carta.* It is an estate for life, which the law gives to a widow for her support and maintenance, and as a home for the domestic duties and affections, and it has generally been regarded as a municipal regulation, established for the benefit of civil society. It is a gift of the law, and the right is not derived from the nuptial contract.

A man may deprive his children and kindred of his estate, by deed or devise, but he cannot dispose of that estate which the law, in its beneficence, gives to the widow. Even if he makes a devise to her, in lieu of dower, she may elect, whether she will take the gift of the husband, or the gift of the law, and she may have the value of both estates, ascertained, before she makes her election. In the case of the insolvency of the husband, the common law preserves dower as a *tabula in naufragio,* to keep the widow from sinking into poverty and distress. So great was the care shown to widows, that centuries ago, the maxim became prevalent " that the law favors three things : Life, Liberty and Dower." An instance, of this peculiar favor may be found in the early history of the common law, in dower *de la plus belle,* when the widow was endowed of lands, in socage, " as being the fairest portion of the lands, held by her deceased husband." This species of dower, has long since passed away, with the military tenures in which it originated, but in most of the States of this country, where the doctrines of feudalism have never prevailed, the same kindly spirit of the law, gives the widow the mansion-house, as being the fairest portion of the estate, for her wants and purposes. When uses were introduced into England, they were not at first recognized by the common law, and were only enforced in the Court of Chancery, which, for a long period was under the control of ecclesiastics, who, in this Court, administered the principles of the civil law ; and it was soon held that the dower, in a *use,* could not be allowed, as it would produce great inconvenience, and such a right was unknown in the system of civil jurisprudence. This doctrine

has now been abolished in England; and in a large number of the American States, a widow is entitled to dower in an equitable estate by express statutes.

The history of the common law shows, that dower was always regarded as a municipal institution, and was not the result of a contract. There were two species of dower allowed by the common law, which, in some respects, were regarded as a part of a marriage contract. A husband *ad ostium ecclesiae,* " after affiance made, and troth plighted," could endow his wife of a certain portion of his lands, to take effect upon his death. This was a kind of bridal gift, and in the time of Glanville the wife was obliged to accept it, in lieu of dower, but at a later period, according to Littleton, the wife, upon the death of her husband, might reject the gift and claim the gift of the common law. Dower *ex assensu patris,* resembled dower *ad ostium ecclesiae,* and was, when a father seized of an estate in fee, allowed his son at the time of espousals, to endow his wife of a certain portion of such estate. Here then, were three parties to the contract, and the widow, on the death of her husband, might enter at once on the estate assigned, although the father was still living. The widow might also reject this *contract dower,* and claim dower at common law, of any lands of inheritance, which belonged to the husband during coverture. As these species of dower were voidable, at the will of the widow, they have, long since been abolished in England, and were never in use in this country.

The introduction of *uses,* and the doctrine that a widow was not dowable of a *use,* soon gave rise to the practice of making provision for a wife, by an ante-nuptial contract, called *jointure,* which was afterwards regulated by the statute of uses, and made a legal satisfaction of dower.

Thus, we see that dower at common law, has always been under the peculiar control of that system of jurisprudence, and this favoring care of widows, has been a marked feature in the institutions of every country, where the common law, has pre-

vailed. This controlling influence of the common law, in mod- ern times, has made widows favorites, even in Courts of Equity, which in cases of difficulty about the assignment of dower, will exercise their extraordinary jurisdiction for the purpose of affording adequate relief.—1 *Story Eq. Juris, Ch.* 12.

A reference to the law, regulating marriage, will show that the right of dower does not constitute a part of the contract. Marriage, as between the parties, is a personal contract, and, when entered into according to the rites of the country, where the parties are domiciled and the marriage is celebrated, will, by the comity of nations, be regarded as a valid contract in any part of Christendom. According to the general rule, the terms of a contract, are governed by the *lex loci*; but this is not the case with marriage, except, as to the validity of the contract and the incidents resulting therefrom, are dependent upon the laws of the matrimonial domicil, and dower arises by the operation of the *lex rei sitae*. *Story on Con. of Laws,* 380.

When persons, who are married in a country, where the common law does not prevail, afterwards become citizens of this State the wife will become entitled to dower, according to our law at the time of the husband's death. The converse of this proposition is equally true; that dower is not a part of the contract of marriage, but, is an estate arising by operation of law, is well settled, both in this country, and in England. Mr. Scribner, in his valuable work on dower, 2 *Vol, p.* 2, says: the results of the English authorities is thus given by Mr. Park : " it will be observed, that this estate arises solely by operation of law, and not by force of any contract, express or implied, between the parties; it is the silent effect of the relation entered into by them, not, as in itself, incidental to the relation, or as implied by the marriage contract, but merely as that contract calls into operation the positive institutions of the municipal law." In *Norwood* v. *Morrow,* 4 *Dev. & B.,* 442, Chief Justice Ruffin, in delivering the opinion of the Court, says : " there is no contract between husband and wife

for courtesy or dower. The interest the one gets in the property of the other, the law which gives for the encouragement of matrimony," " it is certain, that such as her estate (dower) is, the law makes it without any act of her husband, and against his will. See, also, *Rose* v. *Rose*, 63 *N. C.*, 391. Marriage is not only a contract, but, it is an institution coeval with the first exis· tence of the human race. It was ordained, and the first marriage ceremony was celebrated in Eden. It is an institution which is essential to the happiness of mankind, and, the preservation of human virtue. Without it, there can be no civilized society, or well regulated municipal government.

Marriage has, therefore, in every enlightened system of government been regulated by law, and must ever remain in some degree, under legislative control. For many purposes, marriage is a civil contract, and is so treated in Courts of law, but the legislative power of the government, regards it, as an institution of civil society. The Legislature must necessarily have the authority to attach rights, incidents and duties to this important relation, and modify and enlarge them, as the best interests of society and government may require ; and all legislation on this subject must extend to all mariages, both antecedent and subsequent, in order to be uniform and general, in its operation.

In regulating this institution, the common law declares that the effect of a marriage shall be to vest in the husband certain rights as to the wife's personal property in possession, the rents and profits of her real estate, and her chattels real and choses in action ; and in consideratien of these benefits, he is required to take care of his wife, and if he is able, supply her with such things as may be necessary to her comfort in her condition in society. Immediately upon marriage, these rights become vested, and for most purposes, are protected in this State by the Constitution, and cannot generally be divested by subsequent legislation. These rights arise out of the marriage contract, not by any express agreement between the par·

ties, but they are the result of positive law adopted by the legislative authority for the regulation of the marriage relation, as an institution of society. *Logan* v. *Simmons*, 1 *Dev.* 1 *B.*, 13. There are certain incidents of marriage, as curtesy and dower, which do not arise from contract, as we have already seen and they only become vested rights upon the happening of certain contingencies. By a positive rule of law, curtesy becomes a vested right, upon the birth of issue capable of inheriting the estate of the wife, and dower does not become a vested right until the death of the husband.

As long as these incidents, created by law, remain in their inchoate condition, the Legislature may modify or enlarge them at will, as such action will not violate the contract of marriage, or, any vested right resulting therefrom. *Cooley, C. L.*, 361. *Moore* v. *City of N. Y.*, 4 *Seld.* 110, 4 *Wheaton*, 500.

We will now consider whether the Act of the Legislature extending the former statute-dower to the common-law right of dower, and applying it to antecedent marriages interferes with the vested rights of the husband, in his lands, within the meaning of our State Constitution.

If the Act has this effect, he alone, has the right to complain unless creditors or purchasers may have acquired some prior vested right. In the case before us it is not necessary to discuss the latter proposition.

Inchoate dower is a *quasi* incumbrance on the estate of the husband, and somewhat restricts his power of alienation, but this right of the wife, is a mere personal capacity, to take an estate upon a certain contingency, and is not a vested right which disseizes him of his freehold, or deprives him of his property within the meaning of the Constitution. This right of the wife takes effect prospectively—at the time of his death—and has only a contingent retroactive influence. A husband is under a legal and moral obligation to furnish adequate maintenance for his wife during his life, and the

Legislature may, as a general municipal regulation, carrying out the moral obligations of marriage, make suitable provision for her support and comfort after his death. I readily admit that the Legislature, cannot arbitrarily take the property of one person and give it to another for individual advantage, and that the private property of a citizen cannot be taken for ordinary public uses without just compensation; as for roads, public buildings, railroads, &c., as such uses, although public in their nature, are necessarily limited in their operation, and do not confer equal benefits upon all the people. But the paramount principle, which lies at the foundation of all government is, that the general public good is the supreme law, and individual rights and interests, must at all times yield to its control. All men enter society, with the implied understanding, that the sovereign power is unlimited in regulating some of the great fundamental principles of the social compact, when its action is calculated to promote and secure the well-being of the State.

The Legislature has the power of taxation necessary to support the government, of passing general laws as to the devolution and transfer of property, of regulating remedies in the Courts, of abolishing imprisonment for debt, of passing statutes of limitation, of making homestead and personal property exemptions, and other similar remedial legislation. The right of alienation by deed and devise was conferred by statute, and such statutes may be modified or enlarged, when the exigencies of society, may require such alteration. In all such cases of the exercise of the powers of sovereignty, the maxim is, *privatum incommodum publico bono pensatur.*

Surely, there has never been a time in the history of this country, more appropriate than the present, for a liberal exercise of the remedial powers of legislation for the general public good. *Hill* v. *Kesler*, 63 *N. C.*, 437.

Marriage is an institution of civil society, and, the principles regulating it, form an essential part of the general public

laws of every civilized community; and it would be a very narrow view, in times like those through which we have passed, to regard it merely as an individual agreement, governed entirely, by the strict technical rules of ordinary contracts. Marriage, in the contemplation of legislative power, is not a contract, but a *status.* Parties can not have a vested right of property in a domestic relation, therefore, the legislative act under consideration, does not come under condemnation, as, depriving parties of rights contrary to the law of the land. *Cooley,* 311.

The question of the legislative power upon this subject, has frequently been discussed in the Courts, and has given rise to considerable conflict in judicial opinion, but, I think the weight of authority, reason and justice are in favor of the legislative power. Even, if we admit, that there is a reasonable doubt upon the subject, that doubt ought to be solved in favor of the legislative action.

The Legislature in a free government is the direct representative of the people, and as such, may exercise all the powers of sovereignty except so far as it is restrained by plain and express constitutional limitation, and, I think the judicial branch of the government, ought not to declare a statute void, or restrict its operations, except in a clear case of an excess of legislative authority, or where it tends to the manifest detriment of the public good. In the matter before us, I think the legislative action ought to be sustained to its full extent, as, it but restores a time-honored custom of the common law, which is hallowed by the veneration of centuries, and, is the law now existing in at least three-fourths of the governments, which are controlled, by the descendants, of, the anglo-saxon race.

I cannot concur in the opinion of a majority of the Court. JUSTICE RODMAN concurs with me in this opinion.

PER CURIAM.                              Error, to be certified.